## Stephens v. Commonwealth.

February 14, 1947.

J. B. Johnson, Judge.

J. C. Bird for appellant.

Eldon S. Dummit, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE REES—Reversing.

Artie Stephens and Henry Myers were jointly indicted for grand larceny, and were tried together. Both were convicted, and the punishment of each was fixed at confinement in the penitentiary for one year and one day. Myers was placed on probation, but a judgment was entered sentencing Stephens to a term of one year and one day in the penitentiary, and he has appealed.

Stephens and Myers were charged with the theft of woven wire fencing of the value of $20 or more. T. M. Rowe owned a farm in a remote section of McCreary county, and in the latter part of March or early part of April, 1946, it was discovered that several rods of fence had been removed from the rear of the farm. It was a division fence along the crest of a mountain between the

Rowe farm and the farm on which Artie Stephens lived. T. F. Roundtree, son-in-law of T. M. Rowe, and two deputy sheriffs went to the home of Artie Stephens, and were told by Mrs. Stephens that her husband had gone to the home of Henry Myers, about 2½ miles distant, to assist Myers in building a fence. Roundtree and the two deputy sheriffs went to the Myers home and found Myers and Stephens engaged in building a fence. Two rolls of wire had been stretched, and one roll was lying on the ground. The three rolls were identified as the wire which had been taken from the Rowe farm. The defendants denied that they had cut the wire and taken it from the Rowe farm, but claimed they found the three rolls on a telephone right of way near the farm and carried it to the Myers home. Appellant admitted he had talked with Myers concerning woven wire fence which was difficult to obtain at that time, and had told him he knew where he could get it for him but insisted that he was referring to new wire which he had seen in a store at Oneida, Tennessee. It is argued that appellant's motion for a directed verdict of acquittal should have been sustained, but the evidence was amply sufficient to authorize submission of the question of guilt to the jury.

Appellant complains of the admission over his objections of certain testimony which consisted of a telephone conversation between the witness Lummie King and Ledford Perry. The testimony was inconsequential and not prejudicial, but it was incompetent and should be excluded on another trial.

The court instructed on grand larceny, petit larceny, and taking the property of another without felonious intent, and gave the customary instructions on reasonable doubt as to the degrees of the offense. It is argued that a concrete instruction on appellant's theory of the case should have been given, but his rights were fully protected by the instructions given by the court. He admitted that he assisted Myers in carrying away property which he knew belonged to neither, and, consequently, instruction No. 4 on taking the property of another without felonious intent was the most to which he was entitled.

The most serious question presented is whether the evidence is sufficient to sustain a conviction for grand

larceny. T. M. Rowe died in May, 1946. His son, Ledford Rowe, testified that he knew before his father's death that the wire had been stolen, but did not know how much was missing. T. F. Roundtree, son-in-law of T. M. Rowe, was asked how much wire fencing was taken down, and he answered: "I judge between 25 and 30 rods." When asked concerning its value, he said: "I judge it would be $1.50 a rod, cost that to get wire like that and put it back up in the shape it was in." On cross-examination he admitted that he had not measured the wire or the space from which it was taken, and was guessing as to the amount. He found three rolls of wire at the Myers place, and took two of them back to the Rowe farm. These rolls were 26 or 28 inches high. The third roll was 36 inches high, and was left at the Myers home. The witness admitted that the wire in this roll was old. J. O. McDowell, a deputy sheriff, was asked how many rods of woven wire were in the three rolls found at the Myers place. He answered:

"I couldn't say about that. There was a big roll of the highest wire, looked to be something like 36 inches, maybe, maybe not so high and might have been higher, rolled up, and some lower wire that had been tacked up. There were two different kinds of it, tacked to the bushes around there. I judge that looked to be right at 20 rods or more, or all of it, of the old and new. I am just guessing. I never measured it."

On cross-examination he said he was not present when any measurements were made, and that he was just guessing at the number of rods. He said the large roll of 36 inch wire was old and rusty. This was all of the evidence introduced by the Commonwealth concerning the amount of the wire taken and its value. Several witnesses introduced by the defendants testified that they were present when the three rolls of wire were measured, and that in all there were 12 rods and 13 feet of wire; 7 rods and 8 feet of 26 or 28 inch wire, and 5 rods and 5 feet of old 36 inch wire. The value placed on the wire ranged from 20c to 50c a rod.

It will be noted that the only evidence introduced by the Commonwealth bearing on the amount and value of the wire was based on guesses. A defendant's liberty should not be made dependent on surmise, speculation,

and guesswork. Here, it was within the power of the Commonwealth to establish the amount of stolen wire with exactness and to prove its value with a reasonable degree of accuracy by means other than mere guesses, and it should not be permitted to rely on speculative estimates in the face of testimony of witnesses who made exact measurements. That they may have been interested witnesses does not alter the situation. The fact that they made the measurements, and that the measurements were correct was not controverted. The estimate by the witness Roundtree of $1.50 a rod as the value of the wire evidently was intended by him as an estimate of the value of the wire in place, and included the value of the wire and the cost of labor to attach it to the real estate. This is not the proper criterion of value in cases of larceny. The fence in the present case was a permanent structure and part of the realty. Real estate is not a subject of larceny, and, according to the common law rule, if anything savoring of or adhering to real property is severed and carried away by one continuous act it amounts merely to an act of trespass. Some courts have gone to the extreme of holding that the acts of severance and asportation must occur on separate days, while others hold that the two acts must be so separated by time as not to constitute one transaction. Annotation in 131 A. L. R. 146. There has been a tendency in more recent decisions to discard that technical rule and to adopt what we deem to be the true rule, which is stated as follows in 32 Am. Jur., Larceny, section 83:

"* * * the technical requirement of even a moment's lapse of time has been superseded by decisions adopting the simpler, more modern, and assertedly better doctrine that by the very act of severance the wrongdoer converts the property into a chattel which may be the object of larceny, so that if he then removes the severed property with felonious intent to steal it he is guilty of larceny, whatever dispatch may be employed by him in such removal."

With this rule as our guide, the value of the property stolen is not its value in place, which is its value as real estate, but its value unattached to the real estate. We fail to find any competent evidence from which it can be reasonably deduced that the value of the stolen wire was as much as $20. It follows that the court erred

in giving an instruction on grand larceny. Wigginton v. Commonwealth, Ky., 114 S. W. 1185.

The judgment is reversed with directions to grant appellant a new trial.